STRATES SHOWS, INC., Plaintiff,

v.

AMUSEMENTS OF AMERICA, INC., Rocky Mount Fair, Inc., Fair Management, Inc., Drew Amusement Operators, Inc. d/b/a Drew Expositions; Carolina Cable Lift LLC; Smokey Mountain Amusements, Inc., Amusements of Rochester d/b/a Powers Great American Midways, Meg Scott Phipps Campaign 2000, Friends of Bobby McLamb, Morris J. Vivona, Sr., Morris J. Vivona, Jr., Dominic A. Vivona, Sr., Dominic A. Vivona, Jr., John J. Vivona, Philip A. Vivona, Sebastian J. Vivona, Christopher Robyn Vivona, Norman Y Chambliss III, Margaret Scott Phipps aka Meg Scott Phipps; Robert E. Phipps, Bobby C. McLamb, Linda Johnson Saunders, Michael E. Blanton, Weldon B. Denny, Robbin Lee Turner, Deann S. Turner, Billy Joe Clark, Leslie E. Powers, Richard D. Janas, and James H. Drew, III; Defendants.

No. 5:04–CV–609–FL(1).

United States District Court, E.D. North Carolina, Western Division.

July 25, 2005.

I. Clark Wright, Jr., Ward & Davis, New Bern, NC, for Strates Shows, Inc., a Delaware corporation, plaintiff.

Joseph B. Cheshire, V, Cheshire, Parker, Schneider, Bryan & Vitale, John Keating Wiles, Cheshire Parker Schneider, Bryant & Vitale, Raleigh, NC, Alan W. Duncan, Smith Moore LLP, Greensboro, NC, Shannon R. Joseph, Smith Moore, LLP, Montaye Sigmon McGee, Smith Moore, LLP, R. Daniel Boyce, Boyce & Isley, PLLC, Raleigh, NC, C. Thomas Ross, Ross Law Firm, Winston–Salem, NC, David William Long, Poyner & Spruill, Raleigh, NC, Samuel T. Currin, Currin Law Firm, PLLC, Joseph Thomas Knott, III, Knott, Clark, Berger & Whitehurst, LLP, Raleigh, NC, for Amusements of America, Inc., a New Jersey corporation, Rocky Mount Fair, Inc, a North Carolina corporation, Fair Management, Inc, a Florida corporation, Drew Amusement Operators, Inc., a Georgia Corporation dba Drew Expositions, Carolina Cable Lift, a North Carolina limited liability company, Smokey Mountain Amusements, Inc., a Delaware corporation, Powers Great American Midways, a North Carolina business entity, Meg Scott Phipps Campaign 2000, a political campaign committee, Friends of Bobby McLamb, a political campaign committee, Morris J. Vivona, Sr., Morris J. Vivona, Jr., Dominic A. Vivona, Sr., Dominic A. Vivona, Jr., John J. Vivona, Philip A. Vivona, Christopher Robyn Vivona, Norman Y. Chambliss, III, Margaret Scott Phipps aka Meg Scott Phipps, Robert E. Phipps, Bobby C. McLamb, Linda Johnson Saunders, Michael E. Blanton, Weldon B. Denny, Robin Lee Turner, Deann S. Turner, Billy Joe Clark, Leslie E. Powers, Richard D. Janas, James H. Drew, III, Sebastian J. Vivona, Amusements of Rochester, Inc., d/b/a Powers Great American Midways, defendants.

Bobby C. McLamb, Lillington, NC, Pro se.

## ORDER

FLANAGAN, Chief Judge.

This matter is before the court upon defendants' motions to dismiss or for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(c) (DE #'s 59, 82, 85, 89, 90). Plaintiff has responded, and this matter is ripe for ruling. For the following reasons, the court grants defendants' motions.

## STATEMENT OF THE CASE

Plaintiff commenced this action on August 23, 2004, asserting claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), based upon illegal campaign contributions solicited by defendant Margaret Scott Phipps ("Phipps") for the position of North Carolina Commissioner of Agriculture, and the related process of selecting providers for the North Carolina State Fair midway and elevated cable lifts or Sky Rides projects. Plaintiff asserts related state law claims based upon fraud, civil conspiracy, tortious interference with business relations, unfair and deceptive trade practices, conversion, and misappropriation. Plaintiff seeks compensatory, treble and punitive damages, as well as costs and attorney's fees.

In January, 2005, defendants Phipps and Robert E. Phipps filed a motion to dismiss asserting, *inter alia*, that plaintiff has failed to sufficiently allege causation and injury, thereby subjecting this action to dismissal for lack of standing or failure to state a claim. On March 28, 2005, defendants Norman Y. Chambliss, III, ("Chambliss") and Rocky Mount Fair, Inc.,

("Rocky Mount"), filed a motion for judgment on the pleadings also asserting, *inter alia*, that plaintiff lacked standing to assert its RICO claims. Plaintiff timely responded to each of these motions. In addition, defendants Carolina Cable Lift, James H. Drew, III, ("Drew"), Smokey Mountain Amusements, Inc., Billy Joe Clark, and Weldon B. Denny ("Denny") filed separate motions to dismiss, adopting the arguments of defendants Phipps, Robert E. Phipps, Chambliss and Rocky Mount. Defendants Phipps, Robert E. Phipps, Chambliss and Rocky Mount filed separate replies.

Of the remaining defendants, the following filed answers, affirmative defenses, and/or cross-claims for contribution and indemnification: Amusements of America, Inc.; Fair Management, Inc.; Amusements of Rochester d/b/a Powers Great American Midways; Morris J. Vivona, Sr.; Morris J. Vivona, Jr.; Dominic A. Vivona, Sr.; Dominic A. Vivona, Jr.; John J. Vivona; Philip A. Vivona; Sebastian J. Vivona; Christopher Robyn Vivona; Bobby C. Mclamb; Michael E. Blanton; Robbin Lee Turner; Deann S. Turner; Leslie E. Powers; and James H. Drew, III. It does not appear from the case file that the following defendants named in the caption of the complaint have responded: Drew Amusement Operators, Inc. d/b/a Drew Expositions; Meg Scott Phipps Campaign 2000; Friends of Bobby McLamb; Linda Johnson Saunders; and Richard D. Janas. On January 18, 2005, plaintiff filed a motion for entry of default against defendant Linda Johnson Saunders ("Sanders"). The Clerk entered default against defendant Saunders on February 4, 2005.

Another competitor for the award of one of the North Carolina State Fair contracts, Phoenix Ski Corporation, filed a related action in this court on July 23, 2004. *See Phoenix Ski Corp. v. Drew Exposition, et al.*, 5:04–cv–517–FL(1). Motions to dismiss filed on similar grounds in that case have been addressed separately by the court.

## SUMMARY OF ALLEGED FACTS

As is relevant to the motions pending before the court, the facts alleged in the complaint may be summarized as follows. Plaintiff is a family-owned carnival midway company that commenced business in 1923. ¶ 37.[1] For many years leading up to 2002, under the direction of the Agriculture Commissioner, plaintiff successfully and safely operated the midway for the North Carolina State Fair ("State Fair"). ¶¶ 37, 42, 77.

In 1999, former Agriculture Commissioner Jim Graham announced that he would not seek re-election in 2000. ¶ 42. At some point during that year, defendants Morris J. Vivona, Jr., Norman Y. Chambliss, III, Rocky Mount Fair, Inc., Amusements of America, Inc. (AOA), and other associated defendants (hereinafter the "Vivona/AOA" defendants) agreed to work together to get an inside track to the "right people" and obtain the State Fair midway contract. ¶ 55.

In 1999 and early 2000, defendants Bobby C. McLamb ("McLamb") and Phipps were two candidates for the democratic primary for Commissioner of Agriculture. Around that time, the Vivona/AOA defendants helped defendant McLamb illegally obtain a $75,000 loan to help pay for campaign costs. ¶¶ 57, 58. On May 2, 2000, defendant McLamb lost the Democratic primary to defendant Phipps. ¶ 59. Thereupon, defendant McLamb pledged his support to defendant Phipps in return for Phipps' promise to help McLamb pay his campaign debt. ¶ 59.

[1]. Paragraph numbers refer to paragraphs in the complaint.

Around May 2000, defendant James H. Drew, III ("Drew"), met with defendants Phipps and Denny and made illegal cash payments to Phipps to garner favor for defendant Drew in potential fair contracts. ¶ 62. Also around May 2000, defendant Chambliss assisted defendant McLamb in obtaining a loan, the proceeds of which were transferred to defendant AOA. ¶ 64.

In July 2000, the Vivona/AOA defendants, through defendant Chambliss, invited defendant Phipps to visit the Ohio State Fair as a guest of the Vivona/AOA defendants, who operated the midway at the Ohio State Fair. ¶ 66. Plaintiff Phipps informed plaintiff that she would be visiting the Ohio State Fair, in an effort to extort campaign contributions from plaintiff. ¶ 67. In August 2000, defendant Phipps visited the Ohio State Fair, at defendants' expense, and, at that time received various illegal cash payments from the Vivona/AOA defendants. In September 2000, defendant Phipps received further illegal cash payments from defendant Drew. In September 2000, defendant Phipps personally assisted defendant McLamb in extending the maturity date on his loan. ¶¶ 74–76.

Leading up to the election in November 2000, defendant Phipps vowed that "if it were left to me, Strates Shows [Inc.] would never get the State Fair midway contract." ¶ 77. On November 7, 2000 defendant Phipps was elected Commissioner of Agriculture. Following her election, defendant Phipps announced that defendants McLamb, Saunders and Denny would serve in various positions within the Department of Agriculture. ¶¶ 82–83. Phipps continued to consult with defendant Chambliss about raising money from the Vivona/AOA defendants. ¶¶ 78, 80–81.

During the period from November 2000 to February 2001, in response to requests and mailings from defendants, plaintiff, "through its owners and concessionaires,"

made a number of lawful, public and properly document contributions to defendant Phipps' campaign fund. ¶ 90. The proceeds of these contributions were used to fund the loan of defendant McLamb, which, in turn, was further restructured for purposes of concealment. ¶¶ 87–92, 94–97. As a result of these contributions, defendant Phipps made false assurances that she would be "working with" plaintiff on the State Fair, assurances which defendant Phipps used to extort further contributions. ¶ 93.

In April 2001, defendant Phipps formed the North Carolina State Fair Advisory Committee, which was presented to the public as a means to create a new, open, bidding process for the State Fair midway contract, but used, in actuality, to ensure the award of the midway contract to the Vivona/AOA defendants. ¶ 97.

In August 2001, defendant Chambliss, reimbursed through the Vivona/AOA defendants, provided an additional unreported cash loan to defendants Phipps and Saunders. Defendant Saunders also traveled again to the Ohio State Fair, where a member of the Vivona/AOA defendants handed defendant Saunders a $10,000 unreported cash payment. ¶¶ 104–05. Defendant Phipps accepted further unreported contributions during this time period, and continued to use the McLamb loan as a concealment tool. ¶¶ 108–113.

On October 5, 2001, bid proposals for the 2002 State Fair midway were formally solicited by defendant Phipps in her capacity as Agriculture Commissioner. Plaintiff and the Vivona/AOA defendants. were among ten separate carnival companies to submit bid proposals for the midway contract. On November 12 and 13, 2001, the Fair Advisory Committee heard final presentations and reviewed bid proposals from eight separate carnival midway companies that had met their strict qualifications for

the midway contract. During this time, defendants Chambliss and Saunders provided the Vivona/AOA defendants with inside information regarding the types of questions posed by the Fair Advisory Committee during earlier presentations by competitors. ¶¶ 114–115.

Following the bid presentations, defendant Phipps required each Fair Advisory Committee member to list the names of three midway providers, in no particular order, from which she would consider the votes and make a final midway provider decision. Several members, excluding defendant Chambliss, objected to this procedure and insisted on handwriting their "first choice" on the paper. Considering these notes and other comments by committee members, more members of the Fair Advisory Committee, excluding defendant Chambliss, backed plaintiff than any other bidding midway provider. ¶ 116; see Pl's Mem. in Opp. to Phipps, Ex. A.

Following the vote, defendant Chambliss gathered the papers and provided defendant Phipps with a summary of the various bid proposals, recommending the award of the midway contract to the Vivona/AOA defendants. Several days later, defendant Phipps publicly announced her decision to award the midway contract to the Vivona/AOA defendants. ¶ 117. In addition, defendant Phipps chose not to open the Mountain State Fair contract for competition and continued the contract with defendant Drew. ¶ 121.

Concerning the Sky Rides leases, in January 2001, defendant Drew discussed with "fair officials" his concept for the construction and operation of a new ride at the State Fair and Mountain Fair also known as "Sky Rides." ¶ 128. Plaintiff had discussed a similar proposal for the construction and operation of Sky Rides at the State Fair in 1999, and had a favorable reception from former Commissioner Graham, but commencement of construction was delayed due to state funding cuts. ¶ 127. In January 2001, defendant Drew requested and received permission to do survey work in furtherance of the development of his concept, the opportunity of which was not given to other interested parties. ¶ 129. Defendant Drew prepared draft leases to the fair officials proposing 15 and 25 year terms for the Sky Ride leases at the State Fair and Mountain Fair, respectively. ¶ 130.

In August 2001, defendant Drew made a third illegal cash payment to defendant Phipps, with the aid of defendants Denny and Saunders. At the same time, Defendant Drew requested that defendant Denny arrange to have the Sky Rides contracts and leases awarded to his companies on a non-competitive basis. ¶ 131. Although defendants determined that a competitive proposal process would be used, defendant Drew learned of the decision to solicit proposals early on, which enabled Drew to refine its proposals and arrange bids from subcontractors and suppliers. ¶¶ 132–134. Leading up to the time of the public announcement for proposals, defendant Denny made changes to the requirements in the announcement to mirror the proposals already developed by defendant Drew. ¶¶ 134–36.

In early December 2001, the Department of Agriculture issued a request, in limited circulation publications, for proposals for the Sky Rides. "[T]he limited publication of the notice of the request for proposals was done to limit competition and thereby enhance the opportunity for Defendant Drew to receive the leases." ¶ 136. All interested entities other than defendant Drew only had, at most, 17 days for the preparation of their proposals in advance of the proposal deadline. Id.

Proposals for the Sky Ride contract and leases were submitted by defendant Drew, plaintiff, and one other bidder, Phoenix Ski

Corporation, ("Phoenix"). Defendant Drew's proposal was the least favorable to the State of North Carolina, in terms of potential state revenue. The proposal by plaintiff was considerably more favorable to the State of North Carolina than that of defendant Drew. ¶¶ 140–142. Ultimately defendant drew received the Sky Ride contract and leases, due to its unlawful influence over defendant Phipps and other defendants. ¶ 139.

On December 6, 2001, plaintiff sent a letter and request for documents to defendant Phipps protesting the decision to award the midway contract to the Vivona/AOA defendants. Two members of the North Carolina legislature filed a formal request for a legal opinion from the North Carolina Attorney General's Office on whether approval by the Board of Agriculture was required to award the midway contract. ¶¶ 144–45. In the meantime, defendant Chambliss encouraged the North Carolina Attorney General's Office to provide defendant Phipps with a favorable opinion, confirming her authority to award the contract. On January 26, 2002, plaintiff filed an administrative appeal with the Office of Administrative Hearings (OAH) challenging the award of the midway contract. That same day, the North Carolina Attorney Genera's Office issued an opinion letter stating that defendant Phipps had authority to enter into the midway contract without approval of the Board of Agriculture, primarily relying on the fact that prior commissioners of agriculture had selected the midway provider without opposition. ¶¶ 148–152.

Following the award of the midway contract, the Vivona/AOA defendants promised to compensate defendant Chambliss in the amount of $50,000 for his efforts in helping them obtain the midway contract. In April, 2002, during proceedings for the administrative appeal, defendants McLamb and Saunders perjured them-

selves. Before defendant Phipps could be deposed, defendant Phipps signed a settlement agreement resolving plaintiff's administrative appeal. ¶¶ 158–160.

In December 2002, defendant Phipps awarded the 2003 midway contract to the Vivona/AOA defendants, without any competitive bid process. ¶ 170.

Over time, as a result of the challenges commenced by plaintiff, various state and federal investigators began to look into defendants' conduct, ultimately leading to criminal convictions against several of the defendants in this action. Defendant Phipps was convicted in federal and state court to numerous public corruption charges. Defendant Sanders was convicted of extortion and related charges. Defendant Denny and defendant Drew were convicted of perjury charges. Defendant McLamb was convicted of mail fraud and extortion. Defendant Chambliss and defendant Morris Vivona, Jr., were convicted of obstruction of justice. ¶¶ 171–179.

Defendant Phipps resigned as Commissioner of Agriculture on June 6, 2003. Interim Commissioner Cobb voided and terminated the 2003 midway contract with the Vivona/AOA defendants, and stated that public confidence could be restored through an objective bid process. ¶ 181.

As injury, plaintiff claims that it was damaged by the failure to award the Sky Ride leases and 2002 midway contracts to plaintiff, both of which, plaintiff claims, would have been awarded to it, but for the unlawful conduct of defendants. ¶ 126, 143. Second, plaintiff claims that, due to the illegal acts of defendants, plaintiff incurred over $10,000 in costs in preparation and submission of its Sky Rides proposals and 2002 midway bid proposal. ¶¶ 125, 142, 188. Third, plaintiff claims that it incurred legal fees and costs in pursuing the bid protest at OAH. ¶ 188. Finally, plaintiff claims as damages the legal campaign contributions

that it made to defendant Phipps due to defendants' fraud and extortion. ¶ 188.

## DISCUSSION

### I. Motion to Dismiss Standard

The purpose of a motion to dismiss, under Federal Rule of Civil Procedure 12(b)(6), is to test the legal sufficiency of the complaint, not to resolve conflicts of fact or to decide the merits of the action. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir.1999). The court may dismiss a complaint for failure to state a claim only if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a motion to dismiss, the court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993). Nevertheless, while the court must take the facts in the light most favorable to the plaintiff, the court "need not accept the legal conclusions drawn from the facts [or] ... unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir.2000); *see also Labram v. Havel*, 43 F.3d 918, 921 (4th Cir.1995) (stating that the court is not required to accept "conclusory allegations regarding the legal effect of the facts alleged").

Under Fed.R.Civ.P. 12(b)(1), the plaintiff bears the burden of showing that federal jurisdiction is appropriate when challenged by the defendant. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). When the 12(b)(1) motion attacks the complaint as failing to state facts upon which subject matter jurisdiction may be based, the facts in the complaint are alleged to be true and the plaintiff is afforded the same protections he or she would receive under a 12(b)(6) motion. *Adams*, 697 F.2d at 1219.

### II. RICO Claims

In their motions to dismiss, defendants assert, *inter alia*, that plaintiff has failed to sufficiently allege causation and injury, thereby subjecting plaintiff's RICO claims to dismissal for lack of standing or failure to state a claim.[2] In response, plaintiff argues that it has alleged sufficient facts concerning causation and injury to enable it to proceed beyond the pleading stage of the case. Finding defendant's argument on causation and injury to be meritorious, the court need not reach the other grounds for dismissal raised by defendants.

"To make out a civil action for damages under the RICO statute a private plaintiff must demonstrate ... that he has been 'injured in his business or property by reason of the alleged violation of section 1962.'" *Brandenburg v. Seidel*, 859 F.2d 1179, 1187 (4th Cir.1988) (quoting 18 U.S.C. § 1964(c)). Here, assuming, *arguendo*, that plaintiff has properly alleged the violation of 18 U.S.C. § 1962, in that defendants all engaged in a "pattern of racketeering activity," § 1962(a), the critical issue is whether plaintiff has sufficiently alleged injury and causation. *See* § 1964(c).

2. As noted in the statement of the case, defendant Saunders and several other individual defendants did not join in the motions to dismiss by defendants Phipps, Chambliss and Rocky Mount. The court will address the status of claims against these defendants at the end of the analysis of plaintiffs RICO claims.

■ Section 1964(c) "requires the plaintiff to make two closely related showings: (1) that he has suffered injury to his business or property; and (2) that this injury was caused by the predicate acts of racketeering activity that make up the violation of § 1962." *Brandenburg,* 859 F.2d at 1187. "The Supreme Court has explained these injury and causation requirements as aspects of standing, rather than elements of the civil RICO plaintiff's prima facie case." *Id.* (citing *Sedima v. Imrex,* 473 U.S. 479, 496–97, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). "In any event, it is clear that a civil RICO complaint is vulnerable to a motion to dismiss if it fails to allege either an adequate injury to business or property, or an adequate causal nexus between that injury and the predicate acts of racketeering activity alleged." *Id.*

■ Concerning the injury requirement, "[i]njury to mere expectancy interests or to an 'intangible property interest' is not sufficient to confer RICO standing." *Regions Bank v. J.R. Oil Co., LLC,* 387 F.3d 721, 730 (8th Cir.2004) (quoting *Price v. Pinnacle Brands,* 138 F.3d 602, 607 (5th Cir.1998)); *see Anderson v. Kutak, Rock & Campbell (In re Taxable Mun. Bond Sec. Litig.),* 51 F.3d 518, 523 (5th Cir.1995) ("Anderson's suit shows only a lost opportunity to obtain a … loan. Such lost opportunity by itself does not constitute an injury that confers standing to bring a RICO cause of action."); *Steele v. Hospital Corp. of Am.,* 36 F.3d 69, 70 (9th Cir.1994) (holding that, for RICO standing, the plaintiffs must prove a "concrete financial loss," an actual loss "of their own money," and "not mere 'injury to a valuable intangible property interest'"); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 24 (2d Cir.1990) ("[I]njury in the form of lost business commissions … is too speculative to confer standing, because Hecht only alleges that he would have lost com-

missions in the future, and not that he has lost any yet.").

■ Concerning the causation requirement, "cause-in-fact connection, standing alone, does not suffice to establish liability." *Brandenburg,* 859 F.2d at 1189. Rather, RICO requires " 'legal' or 'proximate' cause as well," which involves "a policy rather than a purely factual determination." *Id.* As such, the determination "is properly one of law for the court, which must take into account 'whether the conduct has been so significant and important a cause that the defendant should be held responsible.'" *Id.* (internal citations omitted).

In determining proximate cause under RICO, courts have looked to principles derived from common law and anti-trust cases. *See Mid Atl. Telecom v. Long Distance Servs.,* 18 F.3d 260, 263 (4th Cir. 1994) (citing *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 267–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (equating RICO causation with common law and anti-trust causation tests) and *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 535–36, 103 S.Ct. 897, 74 L.Ed.2d 723(1983) (equating anti-trust causation test with common law proximate cause test)).

Proximate cause factors, taken from these common law and anti-trust sources, include (1) "foreseeability of the particular injury," (2) "the intervention of other independent causes," *see Brandenburg,* 859 F.2d at 1189, as well as (3) "the directness or indirectness of the asserted injury;" (4) "the existence of more direct victims of the alleged violation;" and (5) "the potential for duplicative recovery or complex apportionment of damages." *See Dow Chem. Co. v. Exxon Corp.,* 30 F.Supp.2d 673, 695 (D.Del.1998) (citing *Associated General Contractors, Inc.,* 459 U.S. at 537–44, 103 S.Ct. 897).

In addition, "in a long line of decisions in this circuit, [the Fourth Circuit has] emphasized that proof of causation must be such as to suggest 'probability' rather than mere 'possibility,' precisely to guard against raw speculation by the fact-finder." *Sakaria v. Trans World Airlines*, 8 F.3d 164, 172–173 (4th Cir.1993) (citing *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 241–42 (4th Cir.1982); *Wratchford v. S.J. Groves & Sons, Co.*, 405 F.2d 1061, 1066 (4th Cir.1969); *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir.1958); *Ralston Purina Co. v. Edmunds*, 241 F.2d 164, 168 (4th Cir.1957)). "This emphasis, where causation is dispositive, upon 'probability,' . . . rather than mere 'possibility' as the proper test simply bespeaks the special danger that in a matter so generally incapable of certain proof jury decision will be on the basis of sheer speculation, ultimately tipped, in view of the impossibility of choosing rationally between mere 'possibilities,' by impermissible but understandable resort to such factors as sympathy and the like." *Lovelace*, 681 F.2d at 242.

In this case, plaintiff claims it was injured by defendants' racketeering activity in three respects. First, plaintiff claims that it was damaged by the failure to award the Sky Ride leases and 2002 midway contract to plaintiff, both of which, plaintiff claims, would have been awarded to it, but for the unlawful conduct of defendants. ¶ 126, 143. Second, plaintiff claims that, due to the illegal acts of defendants, plaintiff incurred costs in preparation of its Sky Rides proposals and midway bid proposal. ¶¶ 125, 142, 188. Finally, plaintiff claims that it incurred legal fees and costs in pursuing the bid protest at OAH. ¶ 188.

The court will address each alleged injury in turn.[3]

## A. Midway Contract and Sky Rides Leases

As explained in more detail below, plaintiff's claim that it was injured by not being awarded the midway contract and Sky Rides leases fails both because it is premised upon an expectancy interest and because the injury is not proximately connected to the alleged acts of racketeering activity.

### i. Property Interest

■ Contributing to the speculative nature of plaintiff's RICO injury, plaintiff points to no property interest which it had in the 2002 midway contract or Sky Rides leases prior to the racketeering activity. For instance, plaintiff had no pre-existing leases or contracts with the State that were terminated due to defendant's activities. As such, there is no basis upon which to claim that plaintiff lost a property interest when the midway contract or Sky Rides leases were awarded to another party. At most, plaintiff lost a fair opportunity to submit Sky Rides proposals or to bid on the midway, and was deprived an objective decision-making process. (*See* Compl., ¶¶ 69, 81, 82). Such alleged "[i]njury to mere expectancy interests or to an 'intangible property interest' is not sufficient to confer RICO standing." *Regions Bank*, 387 F.3d at 730; *Price*, 138 F.3d at 607.

Other courts have similarly denied RICO standing where plaintiff only alleged injury in terms of an expected award of a contract or lease. *See e.g., Bonavitacola*

---

**3.** In its complaint, plaintiff also claims as damages legal campaign contributions made to defendant Phipps due to defendants' extortion. ¶ 188. Plaintiff now concedes, however, that such alleged injury does not serve as a proper basis for recovery, where such contributions were made through other individuals. (*See* Pl's Mem. in Opp. to Phipps, p. 8, n. 1). The court, accordingly, will not separately address this alleged injury.

*Elec. Contr., Inc. v. Boro Developers, Inc.,* 87 Fed.Appx. 227, 233, 2003 WL 23155074 (3d Cir.2003) (affirming dismissal of RICO claim, *inter alia,* on basis of lack of standing, where plaintiff claimed it "was denied the opportunity to compete with [defendant] 'on a fair and honest basis,' and consequently lost income and profits that it would have earned if it had been awarded the ... contract"); *Imagineering, Inc. v. Kiewit Pacific Co.,* 976 F.2d 1303, 1310 (9th Cir.1992) (finding allegation of injury based upon failure to award contract to bidding party too speculative for RICO standing); *Tel–Instrument Electronics Corp. v. Teledyne Industries, Inc.,* 934 F.2d 320, 1991 WL 87194, *2 (4th Cir.1991) (quoting *United States v. Berlin,* 707 F.Supp. 832, 835 (D.Va.1989) ("It seems intuitively obvious that other companies, whoever they may be, have no cognizable property interest in the mere expectation of a contract that the government may award to any or none of them.")); *In re American Honda Motor Co., Inc. Dealerships Relations Litig.,* 941 F.Supp. 528, 541 (D.Md.1996) ("[A] mere 'lost opportunity' is not cognizable because it is speculative"); *Northland Equities, Inc. v. Gateway Center Corp.,* 441 F.Supp. 259, 264 (D.Pa.1977) (rejecting anti-trust claim for lost profits based upon failure to award contract to allegedly lowest bidder).

One case cited by plaintiff, *In re American Honda Motor Co., Inc., Dealerships Relations Litigation,* 941 F.Supp. 528, 537 (D.Md.1996), is instructively distinguishable here. In that case, plaintiffs asserted injury under RICO on grounds that defendant dealerships, in competition with plaintiffs, bribed the manufacturer in order to receive an unfair allotments of cars. 941 F.Supp. at 537. Plaintiffs alleged that, but for defendants' bribes, plaintiffs would have received a larger allotment of cars and thus larger profits. *Id.* Over defendants' objection that the injury was specu-

lative, the court allowed plaintiff's RICO claim to proceed. *Id.* at 543.

*In re American Honda Motor Co.* is distinguishable from the case at bar, however, given that the plaintiff dealerships had pre-existing contracts providing for a set amount of allocation, which was then altered due to defendants' illegal activity. 941 F.Supp. at 537 n. 6 (noting "[t]he parties agree that Honda's standard dealership agreement provided for an '85/15' allocation system," with 85 percent set according to previous sales and 15 percent allocation at the discretion of zone managers, thus providing means by which defendants could alter allocations through bribes). In the case at bar, by contrast, plaintiff did not have a pre-existing contract with the State or defendants. Rather plaintiff's claim rests wholly on the allegation that it should have been awarded a contract, in a process that involved submission of competitive proposals to a discretionary administrator. Accordingly, *In re American Honda Motor Co.* is inapposite in the case at hand.

Plaintiff also argues that it has sufficiently alleged injury because defendant Phipps had the intent to "take the State Fair midway contract *away from Strates* and give it to the [entity] that provided her with the most illegal, unreported, under the table campaign contributions, monies and other favors." (Pl's Mem. in Opp. to Phipps, p. 9) (emphasis added). This argument misses the mark, however, given that without a pre-existing contract with the state for the State Fair midway in 2002, defendant Phipps could not have acted to "take" such a contract "away" from Strates. Plaintiff appears to argue that, by virtue of the fact that it was awarded the midway contract as a matter of course in past years, it could expect to a high degree of certainty that it would be awarded the contract in the future. (*See id.* pp.

9, 10). This may be true, but such an expectancy interest, even if highly certain, is not a recognizable property interest. *See Ricker v. Edmisten,* 16 F.3d 411, 1994 WL 32807 (4th Cir.1994).

In *Ricker,* the Fourth Circuit aptly described the distinction between a highly certain expectancy interest and a property interest, in a similar context involving approval of a lease by the North Carolina Department of Administration and Council of State. There, the court noted plaintiff's contention that the "Council routinely approved recommended low bids." *Ricker,* 16 F.3d 411, 1994 WL 32807, *2. Nevertheless, the court noted:

> [Plaintiff's] unilateral expectations, however earnestly held, can not transform the Department of Administration's recommendation of his proposal to the Council into a legally binding contract; therefore, [plaintiff] has no property interest of which to be deprived.

*Id.* at 16 F.3d 411, 1994 WL 32807, *2 (emphasis added). Here, as in *Ricker,* however certain plaintiff was of its entitlement to the 2002 Midway contract, plaintiff alleges no actual agreement between the State and plaintiff whereby the contract would be awarded to it indefinitely. Absent such an allegation of a definite pre-existing contractual right to the midway in 2002, any claim of injury based upon the failure to award this contract to it is based only upon an "expectancy interest" for which RICO does not grant standing. *Regions Bank,* 387 F.3d at 730; *Price,* 138 F.3d at 607.

### ii. Proximate Causation

■ In addition, concerning the selection of the midway contract and Sky Rides leases, plaintiff has not alleged an injury proximately caused by defendants' illegal activity.

One factor weighing against a finding of proximate cause in this case is the existence of intervening factors, such as the presence of other bidders, the lack of a set procedure or criteria for selection of the Sky Rides leases and midway contract, and administrative discretion. For instance, concerning the Sky Rides leases, plaintiff was not only competing against defendant Drew but also against Phoenix Ski Corporation. In addition, according to plaintiff's own allegations, but for the illegal rigging of the process by defendants, there would have been more, rather than less, opportunity for competitors to submit proposals, and greater opportunities for "any other carnival or sky ride company" to do survey work. (Compl., ¶¶ 129, 134, 136). In turn, if there had been more accommodation for preparation of proposals, it is a matter of speculation whether other interested bidders would have contributed separate proposals. Moreover, even assuming that no other interested bidders would have contributed proposals, it is a matter of speculation how the proposals of plaintiff, Drew, and Phoenix Ski Corporation would have looked had there been more time to prepare them on a level playing field. Such speculation allows only a determination of "possible" outcome, thus preventing a determination of proximate cause. *Sakaria,* 8 F.3d at 172–173; *Brandenburg,* 859 F.2d at 1189.

Next, compounding the uncertainty of the content of competing proposals, it is a matter of speculation how the selection process for the midway contract and Sky Rides leases would have been structured, but for the illegal conduct of defendants. For instance, concerning the midway contract, plaintiff alleges that, in prior years, the Commissioner of Agriculture had awarded the midway contract to the company of his choosing, and that no alleged bidding process had been followed. (*See* Compl., ¶¶ 37, 152 (noting "the fact that prior commissioners of agriculture had selected the midway provider without opposition"); Pl's Mem. in Opp. to Phipps, p. 9

(noting "the decision of former Commissioner Graham to award the 2001 midway contract to Strates prior to leaving office")). Likewise, plaintiff alleges that defendant Phipps simply "chose not to open the Mountain State Fair contract for competition and continued the contract with Defendants Drew/Drew Expos" in 2002. (Compl., ¶ 121). Therefore, assuming that defendant Phipps had not used a bidding process, it is a matter of speculation what kind of process would have been used in its place.

■ Moreover, assuming, *arguendo*, that a competitive bidding process would have been used, administrative discretion prevents any after-the-fact judicial determination of which competitor likely would have been selected. On this point, plaintiff argues that it should be given the opportunity to prove, with further discovery, the reasons why it would have been selected for the 2002 midway contract. (Pl's Mem. in Opp. to Phipps, p. 12; *see* Compl., ¶ 126). For instance, it contends that it could discover how every member of the fair advisory board would have voted on the competitive bids. (*See id.*, pp. 12–13, citing newspaper interviews with fair advisory committee members). This argument, however, misses the point. Even if plaintiff could present evidence concerning the intent of each member of the fair advisory board, and even if such evidence showed an intent to vote for plaintiff, it is a matter of speculation 1) whether the fair advisory board would have been asked to give first place votes or a top-three choice, 2) which administrator would have had the final decision, (i.e., Commissioner of Agriculture, Board of Agriculture, Department of Administration, or Council of State), and 3) whether such administrator would be bound by the recommendation of any advisory board or subordinate administrator in selecting a winning bidder. Indeed, under North Carolina law, even a lease award recommended by the Department of Administration is not subject to automatic approval by the Council of State. *See Ricker*, 16 F.3d 411, 1994 WL 32807 at *2.

Similarly, the level of discretion bestowed upon state officials in considering proposals for the Sky Rides project also contributes to the speculative nature of the injury alleged. Although plaintiff alleges that it would have been awarded the Sky Rides project because it submitted a "superior financial offer," supported by "superior experience," and "unequaled familiarity with the layout and operation of the State Fair midway," (Compl., ¶ 143), considering the other circumstances alleged, the court need not credit plaintiff's conclusory allegation of causation. *See Eastern Shore Mkts.*, 213 F.3d at 180. In this case, regardless of the factors favoring selection of plaintiff's proposal, the presence of administrative discretion under state law prevents determination of a probable winning bidder.

First, assuming competitive bidding requirements did not apply, only broad guidelines would have circumscribed the discretion of the administrator. *See* N.C. Gen.Stat. § 146–29 ("If, after investigation, the Department of Administration determines that it is in the best interest of the State that land be sold, leased, or rented, the Department shall proceed with its sale, lease, or rental ....") 146–29.1 (stating that real property may not be leased for "less than fair market value"). Next, even for proposals evaluated according to strict statutory bidding requirements, the decision-maker retains discretion to consider multiple subjective factors. *See* N.C. Gen. Stat. § 143–129 ("Proposals may be rejected for any reason determined by the board or governing body to be in the best interest of the unit .... The procedure ... may be repeated if necessary in order to secure an acceptable contract within the funds available therefor."); *Kinsey Con-*

*tracting Co. v. Fayetteville*, 106 N.C.App. 383, 416 S.E.2d 607, 609 (1992) (interpreting N.C. Gen.Stat. § 143–129 as requiring inquiry into the "skill, judgment and integrity necessary to the faithful performance of the contract, as well as sufficient financial resources and ability"). Which factors the decision-maker would have weighed over others is not subject to after-the-fact determination. *See Mullen v. Louisburg*, 225 N.C. 53, 60, 33 S.E.2d 484 (1945).

In sum, but for the corrupt actions of defendants, plaintiff's Sky Rides proposal and 2002 midway bid would have been one of several bids evaluated according to discretionary criteria, which are not subject to determination at the level of "probability" which the proximate cause inquiry requires. *Sakaria*, 8 F.3d at 172–173; *see Dow Chem. Co.*, 30 F.Supp.2d at 695 (noting that injury plaintiff's alleged injury was too speculative under RICO where it depended upon "intervening decisions" by government agencies, which, in that case, involved "discretion whether or not to grant patent property rights").

Another consideration weighing against a finding of proximate cause is the collateral nature of any after-the-fact reconstruction of the Sky Rides and midway bidding process. In order to determine who would have been awarded these contracts and leases, but for the actions of defendants, the court, in effect, would conduct a trial within a trial, sitting in the place of the appropriate State administrator, considering administrative factors and criteria relevant to the time period, and allowing any interested party the opportunity to submit evidence on proposals it could have offered. Indeed, in its own lawsuit filed in this court, Phoenix Ski Corporation contends that it had a superior proposal for the Sky Rides project, and seeks to present evidence of the reasons for its superiority. Nevertheless, as much as such a determination is technically pos-

sible, proximate cause principles do not permit such an after-the-fact, hypothetical, determination of causation and injury. *See Associated General Contractors*, 459 U.S. at 544, 103 S.Ct. 897 (stating that any attempt to ascertain damages with such precision 'would often require additional long and complicated proceedings involving massive evidence and complicated theories,' and noting strong interest in keeping causation determinations within "judicially manageable limits" and avoiding "massive efforts to apportion the recovery among all potential plaintiffs"); *Brandenburg*, 859 F.2d at 1189 (contrasted with the cause-in-fact determination, proximate cause involves a "policy rather than a purely factual determination").

Finally, as plaintiff recognizes in its own complaint, the "intentional and outrageous actions of Defendant Meg Scott Phipps, in concert with the actions of all other Defendants named herein," has wrought "immeasurable damage" to "all citizens of North Carolina." (Compl., ¶ 171). Like the alleged damage to plaintiff, the damage to the State and its citizens is immeasurable because it is intangible and involves numerous interceding factors. Nevertheless, the State and its citizens are no less "direct victims of the alleged conspiracy" as plaintiff, providing an additional factor against an award to plaintiff under RICO in this case. *See Associated General Contractors, Inc.*, 459 U.S. at 537–44, 103 S.Ct. 897.

In its brief in opposition to dismissal, plaintiff cites several cases which are distinguishable or inapposite to the case at hand. For instance, plaintiff cites to *Mid Atlantic Telecom, Inc., v. Long Distance Services, Inc.*, 18 F.3d 260 (4th Cir.1994), in which the plaintiff and defendant were two competitors in the business of providing long distance services. As alleged, defendant had devised a fraudulent

scheme to trick customers into thinking that they were receiving lower rates, when in reality the customers were being charged based upon inflated minutes. In turn, plaintiff was forced to offer lower rates (thereby losing revenue) or lose customers (thereby also losing revenue). 18 F.3d at 261. The district court held that the injury alleged was too indirect to satisfy RICO standing, but the Fourth Circuit reversed. In applying proximate cause factors, the court noted plaintiff's allegations that defendant had used its fraudulent scheme to "entice customers away" from plaintiff and "eliminate [plaintiff] as a competitor." *Id.* at 263. The court also noted:

> Given the opportunity to engage in discovery, ... [plaintiff] may be able to show that while the scheme was initially aimed only at defrauding [defendant's] customers, [defendant] broadened the sweep of the intrigue to include [plaintiff] as a direct target (i.e., to obtain an unfair competitive advantage in recruiting [plaintiff's] customers). Discovery might or might not reveal that the artificially low billings were purposefully devised to lead to harm to Mid Atlantic.

*Id.* at 263. Drawing from this language, plaintiff argues that because it was the "sole target and intended victim of" defendants' fraudulent acts, this should permit a finding of proximate cause in the case at bar. (Pl's Mem. in Opp to Phipps, p. 10; Pl's Mem. in Opp. to Chambliss, p. 15).

*Mid Atlantic Telecom,* however, is distinguishable because it involved alleged factors not present in this case. Most notably, where *Mid Atlantic Telecom* involved only two directly competing businesses, this case involves competition between multiple bidders who had met qualifications to bid on state fair projects. Accepting as true plaintiff's allegation that defendants' sole intent was to deprive plaintiff of State Fair contracts, other intervening factors, such as the presence of other qualified competitors, the variability of selection procedures, and the discretion of the administrator, make a finding of probable or proximate injury impossible. Moreover, in *Mid Atlantic Telecom,* plaintiff did not just allege that future revenue opportunities were lost, but rather alleged, in part, that revenues already had been lost due to the necessity of offering lower rates and due to customers who had left plaintiff for the directly competing defendant. 18 F.3d at 264. Here, by contrast, plaintiff only alleges the loss of an opportunity to contract, and has not alleged that any pre-existing contracts with customers were lost or made less profitable due to defendants' actions. Therefore, *Mid Atlantic Telecom* is inapposite to the case at hand.

Plaintiff also cites to a district court opinion in *Mylan Labs., Inc. v. Akzo, N.V.,* 770 F.Supp. 1053, 1084 (D.Md.1991), in which RICO causation was one of many other issues more extensively discussed. In that case, defendant drug manufacturers bribed defendant government administrators to accelerate government approval of defendants' generic drug applications. 770 F.Supp. at 1058. Defendants also conspired to delay approval of plaintiff's drug applications, allegedly causing injury to plaintiff *Id.* In those circumstances, the court held:

> "bribes given and received were allegedly received for the purpose of advancing the bribing company's [drug applications] at the expense of other companies who had submitted [drug applications] for the same drug. Thus, the injury caused those other companies, such as [plaintiff] is a foreseeable recognizable result of the predicate actions."

*Id.* Concerning this discussion of injury and causation, *Mylan* is distinguishable. There, plaintiff alleged that the critical factor in approval of competing drug appli-

cations was the timing of the application. 770 F.Supp. at 1058 ("[T]he most critical element in determining the ability of a firm to compete successfully in the sale of a particular generic drug is the firm's rank in the FDA approval process."). Otherwise, so long as such applications met noncompetitive objective criteria, they would be approved on a "first-in, first-out basis." *Id.* Thus bribes which altered the speed at which plaintiff's drug applications were approved had a direct adverse effect upon plaintiff's revenues. *Id.* at 1058.

In the case at bar, by contrast, the relationship between the AOA/Vivona defendants' bribery and harm to plaintiff is much more indirect and speculative. For instance, concerning the 2002 midway contract, plaintiff and defendants were competing for a single contract, the award of which did not depend merely upon timing but rather upon multiple additional factors, including the competing bids and proposals of others. In other words, unlike in *Mylan*, plaintiff's bid proposals for the midway and Sky Rides leases were not just subjected to approval upon meeting noncompetitive criteria, but rather were reviewed in competition with other proposals on a subjective basis. (*See* Compl., ¶ 126 (stating "on the merits of the bid materials, bid presentations, and the selection preferences of the members of the Fair Advisory Committee, plaintiff earned the 2002 midway contract"); ¶ 143 (listing alleged factors bearing on selection of Sky Rides)). Accordingly, the facts of this case are distinguishable from *Mylan*.

In summary, lacking a tangible property interest in the award of future leases and contracts, and lacking any reasonable basis upon which to predict lease and contract awards, plaintiff has no standing to assert a RICO claim based upon the Sky Rides leases or the midway contract.

## B. Costs in Preparing Bids

■ Next, plaintiff claims that it was injured by having to incur over $10,000 in costs in preparation and submission of its Sky Rides proposals and midway bid. (Compl., ¶¶ 125, 142, 188). Such alleged costs, however, do not meet even the cause-in-fact requirement for RICO injury. Namely, even assuming that defendants' unlawful conduct had not taken place and that bids had been received on an even playing field, plaintiff would have incurred expense preparing proposals for the Sky Rides proposals and for the midway bid. (*See e.g.,* Compl., ¶¶ 134, 136, stating that but for the conduct of defendants, plaintiff and others would have had even more time to prepare proposals). Given that such costs would have been incurred either with or without the defendants' illegal acts, plaintiff cannot show that defendants' illegal conduct was even a "cause-in-fact" of plaintiff's costs in preparing the Sky Rides or midway proposals. *Brandenburg,* 859 F.2d at 1189. Accordingly, plaintiff has no standing to assert a RICO claim based upon costs incurred in preparing proposals.

Concerning expenditures made by plaintiff, the court notes one case cited by plaintiff, *Liner v. DiCresce,* 905 F.Supp. 280, 287 (M.D.N.C.1994), which is instructively distinguishable from the case at bar. In that case, plaintiffs were induced to invest in "financial security plans" and defendants fraudulently "promised to pay" benefits in return made by defendants. 905 F.Supp. at 283 & 287. There, the district court rejected defendant's argument that defendant's bankruptcy was an intervening cause which prevented a finding of injury. *Id.* at 287. Rather, the court noted that plaintiffs were "induced to invest in the Plans based on the fraudulent claims" made by defendants, and, as such, "plaintiffs' injuries resulting from the failure of the Plans were directly and proxi-

mately related to the misconduct." 905 F.Supp. at 287.

*Liner* is distinguishable from the case at hand, however, given that in *Liner* plaintiffs directly transferred money to defendants as a result of a fraudulent promise. In this case, by contrast, plaintiff does not claim injury based upon any induced direct transfer of money from plaintiff to defendants. Although plaintiff alleges in its complaint that it was induced to make direct campaign contributions to defendants due to an implied promise by defendant Phipps of a return award of the midway contract, (*see* Compl., ¶¶ 67–68), plaintiff concedes now that it has no claim of injury based upon such campaign contributions, where such contributions could not have been made lawfully by defendant, and where plaintiff cannot recover for contributions made by individuals not party to this lawsuit. (Pl's Mem in Opp. to Phipps, p. 8, n. 1). Moreover, unlike investments made in *Liner*, plaintiff's expenditures made in preparation for bid proposals would have been made even if defendants had not engaged in illegal racketeering activity. Therefore, plaintiff's claim of injury due to expenditures made in preparation for bid proposals fails as a matter of law.

## C. Legal Fees and Costs at Administrative Hearing

■ Finally, plaintiff also claims that it was injured by having to incur legal fees and costs in pursuing the bid protest at OAH. ¶ 188. Nevertheless, such legal fees and costs do not satisfy the standing requirement of RICO. Specifically, these legal fees and costs are not "direct" injury flowing from defendants' illegal conduct, but rather, at best, "indirect" injury which plaintiff did not automatically incur, but chose to incur, in mitigating the effect of defendants' conduct. *See Brandenburg*, 859 F.2d at 1189; *Dow Chem. Co.*, 30 F.Supp.2d at 695 (distinguishing direct in-

jury from indirect injury). Stated differently, plaintiff's choice to pursue a bid protest, however justified, was an "independent cause" which required the payment of legal fees and costs. *See Brandenburg*, 859 F.2d at 1189. Accordingly, while the illegal conduct by defendants may have been the cause-in-fact of plaintiff's legal fees and costs, it was not the "proximate cause" of such fees and costs. *See id.* As such, plaintiff does not have standing to pursue a RICO claim on the basis of fees and costs incurred in protesting the 2002 midway award.

In summary, based upon the foregoing, plaintiff lacks standing to pursue its RICO claims. Therefore, the RICO claims are DISMISSED as to all defendants in this action, including those defendants who did not move to dismiss specifically on this ground. *See United States v. Hays*, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (stating that the court is required to determine standing "even if the parties fail to raise the issue").

## III. Remaining State Law Claims

Having dismissed plaintiff's only federal claims (plaintiff's first and second claims for relief under RICO), the court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims (plaintiff's third through eighth claims). *See* 28 U.S.C. § 1367(c) (stating that the court may decline to exercise supplemental jurisdiction if the court has dismissed all claims over which it has original jurisdiction); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial, ... the state claims should be dismissed as well."); *Park v. Jack's Food Sys.*, 907 F.Supp. 914, 921 (D.Md.1995) (dismissing state law claims without prejudice, where federal RICO claim had been dismissed). Therefore, plaintiff's state law claims are DISMISSED without prejudice.

Finally, where plaintiff lacks standing to pursue its RICO claims, and where the court dismisses plaintiff's remaining state law claims, the court is compelled to SET ASIDE the clerk's entry of default as to defendant Linda Johnson Saunders, pursuant to Federal Rule of Civil Procedure 55(c) ("For good cause shown the court may set aside an entry of default....").

## CONCLUSION

Based on the foregoing, defendants' motions to dismiss or for judgment on the pleadings pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(c) (DE # 's 59, 82, 85, 89, 90), are GRANTED. Plaintiff's RICO claims are DISMISSED for lack of standing, and plaintiff's remaining state law claims are DISMISSED without prejudice, pursuant to 28 U.S.C. § 1367(c).