Universal Cab Co., Inc. v. City of Charlotte, 2015 NCBC 22.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| MECKLENBURG COUNTY | 14 CVS 10914 |

UNIVERSAL CAB COMPANY, INC. and
MOHAMED MOUSTAFA,

Plaintiffs,

v.

CITY OF CHARLOTTE, PATRICK
CANNON, THOMAS J. ORR, TIMOTHY
E. NEWMAN, MOHAMMAD
JENATIAN, THE GREATER
CHARLOTTE HOSPITALITY AND
TOURISM ALLIANCE, TAXI USA, LLC,
CROWN CAB COMPANY, INC., CITY
CAB, LLC,

Defendants.

**ORDER AND OPINION**

{1}     **THIS MATTER** is before the Court upon Defendants City of Charlotte (the "City"), Patrick Cannon ("Cannon"), Thomas J. Orr ("Orr"), Timothy E. Newman ("Newman"), Mohammad Jenatian ("Jenatian"), The Greater Charlotte Hospitality and Tourism Alliance ("HTA"), Taxi USA, LLC ("Yellow Cab"), Crown Cab Company, Inc. ("Crown Cab"), and City Cab, LLC's ("City Cab") (collectively, "Defendants") respective Motions to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the North Carolina Rules of Civil Procedure (the "Motions") in the above-captioned case.  After considering the Motions, briefs in support of and in opposition to the Motions, and the arguments of counsel at a hearing on January 9, 2015, the Court hereby **GRANTS** in part Defendants' Motions to Dismiss under Rule 12(b)(1), **GRANTS** in part the City of Charlotte's Motion to Dismiss under Rule 12(b)(6), and **DISMISSES** Plaintiffs' claims against all Defendants **with prejudice**.

*Hunter Higgins, PLLC by John F. Bloss for Plaintiffs Universal Cab Company, Incorporated and Mohamed Moustafa.*

*Leila Z. Lahbabi, Theodore A. Kaplan, and Elizabeth E. Smithers for Defendants City of Charlotte, Patrick Cannon, in his official capacity, and Thomas J. Orr, in his official capacity.*

*Lincoln Derr, PLLC by Lori Keeton for Defendant Thomas J. Orr, in his individual capacity.*

*Ferguson, Chambers & Sumter, P.A. by James E. Ferguson, II for Defendant Patrick Cannon, in his individual capacity.*

*Womble Carlyle Sandridge & Rice, LLP by Meredith J. McKee and Brandi N. Smith for Defendant Taxi USA, LLC.*

*Rabon Law Firm by Gary W. Jackson for Defendant Crown Cab Company.*

*Rawls, Scheer, Foster, Mingo & Culp, PLLC by Amanda A. Mingo for Defendants Mohammad Jenatian and The Greater Charlotte Hospitality and Tourism Alliance.*

*Rayburn Cooper & Durham, P.A. by G. Kirkland Hardymon, Ross R. Fulton, and Benjamin E. Shook for Defendant Timothy Newman.*

*McNaughton Law, PLLC by Edward J. McNaughton for Defendant City Cab, LLC.*

Bledsoe, Judge.

I.

PROCEDURAL AND FACTUAL BACKGROUND

{2}    The Court limits its recitation of the background to the facts and allegations that are relevant for purposes of resolving the present Motions.

{3}    Plaintiff Universal Cab Company, Inc. ("Universal") is a North Carolina corporation that provides taxi service in the Charlotte area. (Verified Am. Compl. ¶¶ 1, 12.) Plaintiff Mohamed Moustafa ("Moustafa") is the owner and President of Universal. (*Id.* ¶ 2.)

{4}    Defendants Yellow Cab, Crown Cab, and City Cab (collectively "the Cab Defendants") are also taxi service providers in the Charlotte, North Carolina area. (*Id.* ¶¶ 9–11.)

{5}    Defendant City "is a municipal corporation organized under the laws of North Carolina" and the owner and operator of Charlotte Douglas International Airport ("the Airport"). (*Id.* ¶ 3.) Defendant Cannon, at all times relevant to the claims alleged in the Verified Amended Complaint, was "a member of the Defendant

City's Council, the City's Mayor Pro Tem, chairman of the City's Community Safety Committee, and an HTA board member, and is made a defendant in both his individual and official capacities." (*Id.* ¶ 8.) Defendant Orr served as the City's Aviation Director at the Airport at all times relevant to this action and is made a defendant in his individual and official capacities. (*Id.* ¶ 4.)

{6}    Defendant HTA is a non-profit corporation with its principal place of business in Charlotte, North Carolina. (*Id.* ¶ 7.) Defendant Jenatian served as HTA's President at all times relevant to this action. (*Id.* ¶ 6.) Defendant Newman "was the Chief Executive Officer of the Charlotte Regional Visitors Authority ("CRVA"), and an ex-officio director of [HTA]" at all times relevant to this action. (*Id.* ¶ 5.)

{7}    Plaintiffs filed their Complaint and Notice of Designation to this Court on June 12, 2014 in Mecklenburg County. This case was designated as a complex business case on June 13, 2014, assigned to the Business Court (Gale, J.) on June 18, 2014, and subsequently re-assigned to the undersigned on November 19, 2014.

{8}    Plaintiffs filed their Verified Amended Complaint on July 11, 2014, alleging claims against Defendants in various combinations for breach of contract, breach of covenant of good faith and fair dealing, unfair and deceptive trade practices ("UDTP"), antitrust, interference with contract, restitution, rescission, violation of the North Carolina Constitution Article I § 19 ("equal protection"), declaratory judgment, punitive damages, civil conspiracy, and violation of the North Carolina Racketeer Influenced and Corrupt Organizations Act, N.C. Gen. Stat. § 75D-1, et seq. ("N.C. RICO"). (*Id.* ¶¶ 155–216.)

{9}    The following allegations, drawn from the Verified Amended Complaint, form the factual basis of Plaintiffs' claims:

   a.    Universal provided "ground taxicab transportation services, including on-demand transportation via taxi from the Airport" ("Airport Taxi Service") from July 1, 1997 through July 2011 pursuant to a Taxicab Operating Agreement between the City and Universal. (*Id.* ¶ 13.) Airport Taxi Service was a "major component" of Universal's revenues. (*Id.* ¶ 15.)

b.   The pertinent part of Universal's Taxicab Operating Agreement states that "this Agreement shall be deemed automatically renewed for successive one (1) year periods unless and until terminated by either party by giving written notice to the other no more than ninety (90) or less than thirty (30) days to the end of any calendar years." (*Id.* ¶ 21.)

c.   On June 11, 2001, the Airport advised Universal that the contract would be extended on a month-to-month basis pending the completion of a process for application and selection. (*Id.* ¶ 24.) After the completion of the process for application and selection, Universal's Taxicab Operating Agreement once again was subject to automatic renewal for successive one-year periods absent notice of termination by either party under the terms of the Agreement. (*Id.* ¶ 29.)

d.   In June 2006, Moustafa refused to change the paint scheme of Universal's taxis as requested by Newman. (*Id.* ¶¶ 33–34.) At a subsequent meeting, Newman and Jenatian allegedly "referred to Mr. Moustafa as a 'sand n-gger' and 'camel jockey,' which are derogatory terms for people of Middle Eastern descent," and agreed that they "were 'going to get his (Moustafa's) ass out of here.'" (*Id.* ¶ 35.) Moustafa is a "Sunni Muslim from Egypt." (*Id.* ¶ 194.)

e.   In late 2006 or early 2007, Newman and Jenatian began discussions with Orr relating to Airport Taxi Service. (*Id.* ¶¶ 37–38.) Newman's alleged purpose for these discussions was to "oust Universal from providing Taxi Service at the Airport, and to position himself to influence decisions made about future Taxi Service providers at the Airport." (*Id.* ¶ 39.)

f.   Orr allegedly "entered into communications with the owners of NBRS USA Holdings ("NBRS"), which owns [Yellow Cab], in which Defendant Orr agreed that he would cause [Yellow Cab] to be the sole provider of [Airport] Taxi Service." (*Id.* ¶ 42.) When NBRS submitted its application for Airport Taxi Service to the Airport, Orr caused the Airport's long-standing application and selection process to be changed. (*Id.* ¶¶ 45–46.)

g. Orr issued a Request for Proposals for Airport Taxi Service ("RFP #1") on August 18, 2010. (*Id.* ¶ 49.)

h. "On or about August 23, 2010, after the City Council received comments from representatives of the taxi industry, the City Council asked Defendant Orr to change the due date of responses to RFP #1. At the same time, the City Council referred the matter to its Community Safety Committee, which was then chaired by Defendant Cannon, who also at that time acted as the City's Mayor Pro Tem and was an HTA board member." (*Id.* ¶ 50.)

i. At approximately the same time, in August 2010, HTA, through Jenatian, allegedly approached Moustafa and other taxi service providers, "and told them that their problems at the Airport would go away, and that he would secure an operating agreement for them at the Airport, if they paid $5,000.00 to join Defendant HTA as a corporate sponsor." (*Id.* ¶ 51.) Jenatian also allegedly informed Moustafa and other providers that "many members of the City Council, and several City staff personnel, were members of his organization," and that Jenatian "was working closely with Defendants Orr and Newman, who would be making decisions about which Taxi Service providers would receive operating agreements at the Airport." (*Id.* ¶ 52.)

j. In September 2010, Jenatian allegedly solicited Moustafa to make a contribution to a local political campaign, but Moustafa refused to contribute to the campaign. (*Id.* ¶¶ 55–56.) At about the same time, Jenatian introduced Moustafa to Defendant Cannon, and Cannon and Jenatian, together, solicited Moustafa to join HTA. (*Id.* ¶ 57.) Universal thereafter joined HTA, but not at the corporate sponsor level. (*Id.* ¶ 60.) At the same time, Yellow Cab and Crown Cab joined HTA at the corporate sponsor level. (*Id.* ¶ 62.)

k. The Community Safety Committee met on September 7, 2010 to review RFP #1. (*Id.* ¶ 63.) At that meeting, Orr and the Airport's attorney, Leila Lahbabi ("Lahbabi"), made a presentation during which Lahbabi "stated that one of the most frequent complaints made to the Airport was from the CRVA about the quality of the Taxi Service that is available at the Airport." (*Id.*)

l. Plaintiffs allege that Newman and others "caused bogus complaints [about Airport Taxi Service] to be made on behalf of the CRVA for the purpose of undermining Universal's efforts to continue to provide [Airport] Taxi Service." (*Id.* ¶ 65.)

m. The City subsequently decided to issue a new Request for Proposals for Airport Taxi Service ("RFP #2"), which Orr issued on September 20, 2010. (*Id.* ¶¶ 66–67.)

n. Plaintiffs allege that RFP #2 relaxed the requirements of RFP #1 so that City Cab could qualify as a candidate for Airport Taxi Service. (*Id.* ¶ 71.) Plaintiffs assert that under RFP #2, Orr would "enter into an Operating Agreement for Taxi Service with at least one but no more than three companies." (*Id.* ¶ 72.)

o. Pursuant to RFP #2, Orr selected Newman, Charlotte Police Major Timothy Danchess, and Andrew Riolo to serve on the Selection Committee that would "review and analyze the proposals submitted and choose the company or companies who will receive the Operating Agreement(s)." (*Id.* ¶¶ 74–76.) Plaintiffs allege that "Defendant Newman served on the Selection Committee for the purpose of promoting certain HTA members and sponsors, including Yellow Cab and Crown Cab, whose owners he knew personally, and to undermine proposals from companies that were not HTA corporate sponsors, including Universal." (*Id.* ¶ 105.)

p. Universal and eight other taxi companies submitted responses to RFP #2. (*Id.* ¶ 79.) Universal alleges that it was superior to each of the other providers based on the relevant selection criteria and "at a minimum was certainly in the top three candidates." (*Id.* ¶ 80.) Plaintiffs further allege that Yellow Cab and Crown Cab "had consistently been the lowest rated companies in terms of customer service at the Airport." (*Id.* ¶ 92.)

q. The Selection Committee selected five taxi companies to give presentations to the Committee: Universal, the three Cab Defendants, and King Cab. (*Id.* ¶¶ 85–89.) During Universal's presentation, Newman allegedly made

"unfounded accusations" that Moustafa had not paid his personal taxes, (*Id.* ¶ 96), and after the presentation, allegedly "raised additional concerns with the Selection Committee concerning Plaintiff Universal." (*Id.* ¶ 97.)

r. The Selection Committee recommended that Yellow Cab, Crown Cab, and King Cab receive agreements to provide Airport Taxi Service. (*Id.* ¶ 101.) Plaintiff alleges that Yellow Cab and Crown Cab were corporate sponsors of HTA and had given between $15,000 and $20,000 to HTA between 2008 and 2010. (*Id.* ¶¶ 102–04.)

s. In March 2011, following media reports about King Cab's founders' 2006 felony convictions, the City Manager removed King Cab as a candidate for Airport Taxi Service over Orr's objection. Orr subsequently recommended that the City Manager replace King Cab with City Cab as one of the three recommended providers, despite, Plaintiffs contend, qualifications inferior to those of Universal. (*Id.* ¶¶ 107–14, 117.) City Cab was also a member of HTA and, like Yellow Cab and Crown Cab, had contributed $5,000 to HTA. (*Id.* ¶¶ 115–16.) Both City Cab and Yellow Cab had also donated money to Cannon's political campaign. (*Id.* ¶¶ 120–25.) The City Manager replaced King Cab with City Cab on the recommended list. (*Id.* ¶ 117.)

t. Plaintiffs allege that Orr and the Selection Committee were vested with the authority to select the Airport Taxi Service providers. (*Id.* ¶¶ 118–19.) RFP #2 provided, however, that the Selection Committee would choose one to three taxi service providers, each of which would execute taxicab operating agreements negotiated with Defendant Orr as the Airport Director, and that Defendant Orr would then submit each operating agreement to the City Council for approval. RFP #2 expressly stated that "[u]ntil the [Operating] Agreement and all supporting ancillary documents have been approved by the City Council and executed by the Director, the City shall have no obligations [t]hereunder." [1]

---

[1] RFP #2 also provides, in relevant part:

> The selection committee will choose one to three Proposers that can demonstrate, to their satisfaction, the experience, qualifications, and ability

u. On March 28, 2011, the City Council delayed its vote for approval of the proposed operating agreements for Airport Taxi Service and referred the matter back to the City Council's Community Safety Committee for further consideration. (*Id.* ¶¶ 126–27.) Plaintiffs allege that "the City Council's deferring to the Community Safety Committee, controlled by Defendant Cannon, to be the Council's 'eyes,' ensured that Defendant Cannon and his co-conspirators would be the de facto decision makers with respect to the awarding of the contracts." (*Id.* ¶ 128.)

v. The Community Safety Committee held a meeting in May 2011 to review the responses to RFP #2. After presentations from Orr and Lahbabi, the Community Safety Committee recommended that the Cab Defendants be offered operating agreements to provide Airport Taxi Service. (*Id.* ¶¶ 131–34.) Plaintiffs allege that after the meeting, Moustafa asked Cannon if he had read Universal's proposal and that Cannon responded by asking Moustafa "when he was going to support Democrats." (*Id.* ¶ 135.)

w. Plaintiffs allege that "relying on Defendant Orr's and the Community Safety Committee's recommendations, and due to *quid pro quo* exchanges and/or other unlawful conduct involving Defendant Cannon and, upon information and belief, other members of the City Council, the City Council voted to offer

---

necessary to meet the requirements of this RFP and provide first-class Taxi Service. The Selection Committee reserves the right to reject any and all proposals and also reserves absolute discretion in evaluating Proposers and proposals . . . .

Upon review and evaluation of all qualifying proposals, including any interviews that the Airport may elect to require, the Selection Committee will select the Proposer(s) and proposal(s) that they determine, in their absolute discretion, would best provide the Taxi Service. The Director will inform each selected Proposer that it has been selected, subject to final agreement on all terms and conditions of the Operating Agreement. Upon Proposer's execution of such Operating Agreement, the Director shall submit it to City Council for approval. If the Director and the selected Proposer(s) are unable to agree on the final terms, the selected Proposer will be excused from further consideration and the Selection Committee may, at their option, select another Proposer. Until the Agreement and all supporting ancillary documents have been approved by the City Council and executed by the Director, the City shall have no obligations hereunder.

(*Id.* ¶ 119.)

exclusive Taxi Service operating agreements with [the Cab Defendants]." (*Id.* ¶ 138.)

x. On June 15, 2011, Orr sent a letter notifying Universal that its agreement with the City would terminate on July 17, 2011. (*Id.* ¶ 139.) Plaintiffs allege that the City's termination of Universal's Taxicab Operating Agreement was not within the notice period provided in the Agreement and constituted a repudiation of the City's obligations under the Agreement. (*Id.* ¶¶ 141–42.)

y. Plaintiffs further allege they were subsequently approached by a representative of Defendant Cannon and informed that Universal and other cab companies could provide taxi service if they each made campaign contributions to Cannon of $10,000. (*Id.* ¶ 143(a).)

z. In sum, Plaintiffs contend they were "the victims of a systemic campaign by several of these defendants . . . to prevent them from being allowed to fairly compete for, make or enforce an operating agreement with the City to provide Taxi Service at the Airport." (*Id.* ¶ 145.)

{10} Defendants filed their Motions to Dismiss between September 12, 2014 and September 17, 2014.[2] Plaintiffs filed their Omnibus Response in Opposition to the Motions to Dismiss (the "Response") on November 14, 2014. Defendants Crown Cab, Yellow Cab, the City, and Newman filed Replies to Plaintiffs' Response between November 24, 2014 and December 1, 2014.

{11} The Court held a hearing on this matter on January 9, 2015, at which all parties were represented by counsel. The Motions are now ripe for resolution.

II.

ANALYSIS

{12} Defendants' Motions seek dismissal of Plaintiffs' Verified Amended Complaint pursuant to N.C.R.C.P. 12(b)(1) for lack of standing and 12(b)(6) for

---

[2] Defendant Cannon filed his Motion to Dismiss in his individual capacity at the hearing on January 9, 2015, largely adopting the arguments of the other moving Defendants. Defendant City Cab has not filed a written Motion to Dismiss, but contended at the hearing that dismissal of the other Defendants for lack of subject matter jurisdiction required dismissal of City Cab as well.

failure to state a claim. As "[s]tanding is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction," *Neuse River Foundation v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002), the Court first addresses Defendants' Rule 12(b)(1) standing arguments. *See, e.g., In re T.B.*, 200 N.C. App. 739, 742, 685 S.E.2d 529, 531–32 (2009) (standing "is a threshold issue that must be addressed, and found to exist, before the merits of [the] case are judicially resolved") (quotations omitted).

{13} "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." N.C.G.S. § 1A-1, Rule 12(h)(3) (2014). On a motion under Rule 12(b)(1), the Court may consider and weigh matters outside the pleadings in determining its subject matter jurisdiction. *Tart v. Walker*, 38 N.C. App. 500, 502, 248 S.E.2d 736, 737 (1987).

{14} "As the party invoking jurisdiction, plaintiff[] ha[s] the burden of establishing standing," *Queen's Gap Cmty. Ass'n, Inc. v. McNamee*, 2011 NCBC 36 ¶ 13 (N.C. Super. Ct. Sept. 23, 2011), www.ncbusinesscourt.net/opinions/11_NCBC_36.pdf (dismissing action for lack of standing) (quoting *Marriot v. Chatham Cnty.*, 187 N.C. App. 491, 494, 654 S.E.2d 13, 16 (2007)), by "show[ing] facts that if accepted as true would demonstrate the existence of jurisdiction." *Grasinger v. Williams*, 2015 NCBC 5 ¶ 16 (N.C. Super. Ct. Jan. 15, 2015), www.ncbusinesscourt.net/opinions/2015_NCBC_5.pdf (granting in part and denying in part motion to dismiss for lack of standing); *Am. Woodland Indus., Inc. v. Tolson,* 155 N.C. App. 624, 627, 574 S.E.2d 55, 57 (2002) ("The burden is on the plaintiff to demonstrate that the requirement of standing is satisfied.").

{15} The Court will only grant a Rule 12(b)(1) motion "'if the material jurisdictional facts are not in dispute and the moving party is entitled to a judgment as a matter of law.'" *Wilkie v. Stanley*, 2011 NCBC 11 ¶ 7 (N.C. Super. Ct. Apr. 20, 2011), www.ncbusinesscourt.net/opinions/2011_NCBC_11.pdf (denying motion to dismiss for lack of standing).

{16}   In *Neuse River Foundation*, our Court of Appeals set out a three-step process for determining a plaintiff's standing to assert a claim: (1) "'injury in fact' – an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." 155 N.C. App. at 113, 574 S.E.2d at 51 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

{17}   Here, Plaintiffs' claimed injury is two-fold.

<u>Rule 12(b)(1) – Standing – Plaintiffs' Contract-Based Claims</u>

{18}   First, Plaintiffs have asserted claims against the City for breach of contract and breach of the covenant of good faith and fair dealing for the losses they allege they have suffered arising out of the City's alleged early termination of Universal's annually renewing Taxicab Operating Agreement. Plaintiffs' contract-based claims seek relief for sums Plaintiffs claim the City owes to Plaintiffs that were not paid during the term of the Taxicab Operating Agreement. As such, the Court determines that it has subject matter jurisdiction to consider these two claims. *See, e.g., AMOCO v. AAN Real Estate, LLC*, 754 S.E.2d 844, 846 (N.C. Ct. App. 2014) ("In order for a breach of contract claim to withstand a 12(b)(6) motion based on a lack of standing, the plaintiff's allegations must 'either show it was in privity of contract, or it is a direct beneficiary of the contract.'") (quoting *Lee Cycle Center, Inc. v. Wilson Cycle Center, Inc.*, 143 N.C. App. 1, 8, 545 S.E.2d 745, 750 (2001)). Accordingly, to the extent the City seeks to dismiss Plaintiffs' claims for breach of contract and breach of the covenant of good faith and fair dealing for lack of standing under Rule 12(b)(1), the Court concludes that the City's motion should be denied.[3]

---

[3] The Court considers the City's Motion to Dismiss these claims under Rule 12(b)(6) at paragraphs 39–40, *infra*.

Rule 12(b)(1) – Standing – Plaintiffs' Remaining Claims

{19}  Plaintiffs' remaining claims seek the lost profits Plaintiffs allege they would have realized had the City elected to award Universal a new Taxicab Operating Agreement for service at the Airport. Plaintiffs seek to hold Defendants liable for this economic loss by alleging that Defendants implemented the RFP process using illegal and wrongful means, with the intended result that Universal's Taxicab Operating Agreement not be awarded a new Agreement.

a.    Causal Connection between Plaintiffs' Injury and Defendants' Conduct

{20}  Defendants contend Plaintiffs cannot satisfy the second element required to establish standing: an injury fairly traceable to Defendants' alleged conduct. *Neuse River Foundation,* 155 N.C. App. at 113, 574 S.E.2d at 51.   Specifically, Defendants assert that the Charlotte City Council was the body with the sole authority to approve contracts for Airport Taxi Service, and, as such, any injury suffered by Universal on the facts as alleged was the result of the votes of at least eight independent members of the eleven-member City Council, none of whom are defendants or are alleged to have acted improperly or illegally in voting to award the Taxicab Operating Agreements to the Cab Defendants.  (Yellow Cab Br. Supp. Mot., pp. 7–12; *see* City Br. Supp. Mot., pp. 5–6.)[4]

{21}  An injury is fairly traceable to the challenged conduct when a causal connection exists "between the injury and the conduct complained of" and the injury is "not . . . the result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560; *see, e.g.*, *Hamm v. Blue Cross & Blue Shield of N.C.*, 2010 NCBC 14 ¶ 34 (N.C. Super. Ct. Aug. 27, 2010), www.ncbusinesscourt.net/opinions/2010_NCBC_14.pdf ("For an injury to be fairly traceable to the challenged action of the defendant, it must not be the result of the independent action of a third party not before the court.").

---

[4] The City Council approved the Taxicab Operating Agreements with the Cab Defendants by a nine-to-two vote, with Defendant Cannon voting in the majority.

{22} The Court concludes that Plaintiffs' allegations establish that a causal connection does not exist between the alleged injury about which Plaintiffs complain and Defendants' alleged conduct. Although Plaintiffs have alleged that Defendants engaged in numerous nefarious and wrongful acts that caused Plaintiffs' loss, it is undisputed that the decision that caused Plaintiffs' alleged injury was the eleven-member Charlotte City Council's decision not to award Universal a new Taxicab Operating Agreement. (Am. Compl. ¶ 138.) Indeed, the RFP #2 makes clear that "[u]ntil the Agreement and all supporting ancillary documents have been approved by the City Council . . . the City shall have no obligations thereunder" (*Id.* ¶ 119), and shows that the RFP Selection Committee could not enter Taxicab Operating Agreements without the approval of the City Council.

{23} The only member of the eleven-member City Council that Plaintiffs have sued or contend acted wrongfully in casting his or her vote in connection with the Taxicab Operating Agreements is Defendant Cannon. Plaintiffs attempt to create the requisite causal connection by alleging in conclusory fashion that the City Council deferred to Orr's Selection Committee and the City Council's Community Safety Committee and further that the City Council's deference to the Community Safety Committee "ensured that Defendant Cannon and his co-conspirators would be the de facto decision makers with respect to the awarding of the contracts" (*Id.* ¶¶ 119, 128). Plaintiffs, however, do not allege any facts or offer any evidence to support their conclusory assertions concerning the City Council's alleged deference to these Defendants in awarding the Agreements. Plaintiffs' conclusory allegations are not sufficient to survive a challenge under Rule 12(b)(1). *See Neuse River Found.*, 155 N.C. App. at 113, 574 S.E.2d at 51 ("Since [the elements of standing] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."); *Venable v. GKN Automotive*, 107 N.C. App. 579, 584, 421 S.E.2d 378, 381 (1992) (affirming

12(b)(1) dismissal where plaintiff's allegations were "conclusory in nature"); *see also, e.g., Burgess v. Charlottesville Sav. & Loan Ass'n*, 477 F.2d 40, 43 (4th Cir. 1973) ("Mere conclusory allegations in the complaint are insufficient to support jurisdiction.").

{24} Plaintiffs have not alleged or offered evidence that any Councilmember, other than Defendant Cannon, received bribes or other unlawful inducements from any Defendant, and Cannon is the only Councilmember Plaintiffs have elected to sue. Plaintiffs have not alleged or offered evidence that the City Council vote to approve the Agreements was improper, illegal or invalid, or that any member of the City Council, other than Defendant Cannon, acted with any ill will, malice or improper motive against Plaintiffs or had any improper connection to any Defendant.

{25} Furthermore, the *quid pro quo* agreements Plaintiffs allege involved payments of money by the Cab Defendants to HTA and Defendant Cannon, neither of whom made the decision to approve or deny the Taxicab Operating Agreements.

{26} Similarly, Plaintiffs allege that Defendant Cannon controlled the City Council's Community Safety Committee, but it is undisputed that Cannon could cast only one of the five votes on the Committee, and Plaintiffs do not allege or offer any evidence that any of the other members of the Committee received unlawful inducements to cast their votes for the Cab Defendants or that the Committee's vote was illegal or improper.

{27} Likewise, Plaintiffs allege that Newman – and through Newman, HTA – controlled the Selection Committee, but it is undisputed that Newman was only one of three votes on the Selection Committee, and Plaintiffs do not allege or offer any evidence that the two other members of the Selection Committee had any connection to either HTA or Cannon or had any improper reason to favor the Cab Defendants over Universal and the other competing taxi service providers.

{28} Finally, Plaintiffs allege that Orr controlled the RFP process, but it is undisputed that Orr did not have a vote on the Selection Committee, the Community Safety Committee or the City Council, and Plaintiffs do not allege that

any Defendant attempted to improperly influence Orr or give him money, that Orr engaged in any *quid pro quo* arrangements with any Defendant, or that Orr benefitted in any way from, or was even aware of, any donations made to Cannon or HTA by any Defendant.

{29}   Moreover, it is undisputed that Plaintiffs and their attorneys were afforded the opportunity to address the City Council prior to its approval vote, and at that time they informed the City Council of Plaintiffs' allegations of discrimination and claims of illegality in the RFP process. (Yellow Cab's Br. Supp. Mot., pp. 11–12; Yellow Cab's Motion to Dismiss, Ex. A at Minute Book 132, pp. 265–77.) The City Council gave full hearing to Plaintiffs' contentions, considered and rejected a motion to substitute Universal for City Cab as one of the three winning bidders, and thereafter voted against awarding a new Taxicab Operating Agreement to Universal. (*Id.*) Plaintiffs have not alleged or brought forward any evidence to suggest that any of the nine Councilmembers who voted to approve the contracts with the Cab Defendants, other than Defendant Cannon, acted improperly in considering and rejecting Plaintiffs' arguments, and in making their vote.

{30}   In sum, Plaintiffs have not alleged facts, or offered any evidence that shows, that the decision by the Charlotte City Council to award the Taxicab Operating Agreements to the Cab Defendants and to decline to award Universal a new Agreement was the result of anything other than the legal and independent action of the Charlotte City Council, consistent with its legal authority, and acting within its reasonable discretion, to approve or deny the Agreements. Consequently, the Court concludes, based on the allegations and evidence of record, that the alleged injury about which Plaintiffs complain – *i.e.*, the economic losses flowing from the City Council's decision not to award Universal a new Taxicab Operating Agreement – was caused by the independent, legal and valid action of the Charlotte City Council and not by the improper actions of any Defendant.

{31}   Because Plaintiffs therefore have not shown a causal nexus between Universal's alleged injury and Defendants' alleged conduct, Plaintiffs do not have standing to bring their claims. *See, e.g., AMOCO*, 754 S.E.2d at 846 (dismissing for

lack of standing where "the amended complaint did not sufficiently show that plaintiff suffered an injury as a result of the alleged lease breach by defendant"); *McCracken & Amick, Inc. v. Perdue*, 218 N.C. App. 455, 721 S.E.2d 455 (2012) (unpublished) (dismissing claims on Rule 12(b)(1) grounds because injury "still cannot be traced to and does not arise out of the challenged conduct"); *see, e.g., Credigy Receivables, Inc. v. Whittington*, 202 N.C. App. 646, 658, 689 S.E.2d 889, 897 (2010) (affirming award of attorneys' fees under N.C.G.S. § 6-21.5 where plaintiff had no standing to bring suit because it failed to connect defendant to bad debt); *see also, e.g., Frank Krasner Enters. v. Montgomery Cnty.*, 401 F.3d 230, 235 (4th Cir. 2005) ("We have previously denied standing because the actions of an independent third party, who was not a party to the lawsuit, stood between the plaintiff and the challenged actions.").

   b.  Actual or Imminent Injury v. Conjectural or Hypothetical Injury

{32}   The Court further concludes that there also exist intervening factors, that Plaintiffs ignore, which the Court finds preclude a conclusion on the facts alleged that Plaintiffs have suffered an "actual or imminent, not conjectural or hypothetical" injury sufficient to establish standing. *See Neuse River Found.*, 155 N.C. App. at 113, 574 S.E.2d at 51 (identifying standard).  In particular, Plaintiffs ignore the presence of the other losing bidders in the RFP process and simply assume Universal would have been awarded a contract but for Defendants' allegedly wrongful acts.  It is undisputed, however, that Universal was competing not only against the Cab Defendants, but also against five additional competitors for one of the three available Taxicab Operating Agreements.  It is simply a matter of speculation and conjecture that Universal would have been awarded a new Taxicab Operating Agreement had Defendants' alleged misconduct not occurred.  Similarly, given Plaintiffs' attack on the RFP process itself, it is also a matter of speculation and conjecture how the process would have been structured but for Defendants' alleged misconduct, and further, whether Universal would have been selected through these unknown, yet-to-be-determined, alternative procedures.

{33} As a result, it appears to the Court that but for Defendants' alleged misconduct, Universal's bid would have been one of presumably nine bids (assuming all nine bidders and no others elected to respond to any revised selection process not "controlled" by Orr, HTA, Newman or Cannon) that would have been evaluated under discretionary criteria by a Selection Committee comprised of unknown persons, the Council's Community Safety Committee, and ultimately the City Council itself, with each body relying upon their members' own individual subjective assessments of the bidders' relative qualifications, experience, written and oral presentations, and overall ability to provide the best taxi service at the Airport, in casting their votes to approve the awarding of the Taxicab Operating Agreements. The Court cannot conclude that Plaintiffs' likely success in this speculative alternative scenario is sufficiently certain to warrant a finding that Plaintiffs have suffered an "actual or imminent" injury under prevailing precedent.

{34} To the contrary, on the facts here, the Court concludes that Plaintiffs' alleged injury is merely "conjectural or hypothetical" and cannot support Plaintiffs' standing to assert their claims. *See, e.g., In re Ezzell*, 113 N.C. App. 388, 393, 438 S.E.2d 482, 485 (1994) (dismissing claims for lack of standing because alleged injury was "conjectural or hypothetical" where plaintiff magistrate contended alternative removal process without involvement of district attorney would have yielded different result); *Beachcomber Props., LLC v. Station One, Inc.*, 169 N.C. App. 820, 825, 611 S.E.2d 191, 194 (2005) (dismissing claims for lack of standing where alleged injury was "conjectural or hypothetical" because plaintiff was "without a legally protected interest in the property" at issue); *see generally Strates Shows, Inc. v. Amusements of America, Inc.*, 379 F. Supp. 2d 817 (E.D.N.C. 2005) (dismissing NC RICO claim for failure to show proximate causation where plaintiff was not selected in allegedly corrupt competitive bidding process involving administrative discretion and multiple bidders).

{35} Accordingly, for the reasons set forth above, the Court concludes that Plaintiffs' claims for UDTP, antitrust, interference with contract, restitution, rescission, equal protection, declaratory judgment, punitive damages, civil

conspiracy, and N.C. RICO should be dismissed with prejudice for lack of subject matter jurisdiction.  *See, e.g., AMOCO*, 754 S.E.2d at 845 ("A party that lacks standing to bring a claim constitutes an insurmountable bar to recovery.").[5]

Rule 12(b)(1) – Standing – Moustafa as a Real Party in Interest

{36}  The Cab Defendants also argue that Plaintiff Moustafa is not a real party in interest in this litigation and does not have standing to assert claims for alleged injuries to Universal.  *See* N.C.R.C.P. 17(a) ("Every claim shall be prosecuted in the name of the real party in interest . . . .").  The Court agrees.

{37}  Our Supreme Court has instructed that "[a] real party in interest is a party who is benefited or injured by the judgment in the case. An interest which warrants making a person a party is not an interest in the action involved merely, but some interest in the subject-matter of the litigation." *Energy Investors Fund, L.P. v. Metric Constructors, Inc.*, 351 N.C. 331, 337, 525 S.E.2d 441, 445 (2000). Here, all of Moustafa's alleged injuries result from the City's decision to terminate Universal's annually renewing Taxicab Operating Agreement and to decline to award a new Taxicab Operating Agreement with Universal.  Moustafa is not alleged to be a party to, or a third party beneficiary of, either Universal's terminated or hoped-for Taxicab Operating Agreement with the City.  Moreover, Moustafa, as the "president and owner" of Universal, cannot pursue claims "against third parties for wrongs or injuries to the corporation that result in the diminution or destruction of the value of [his] stock" absent a "special duty" or a "separate and distinct injury." *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997). Moustafa's alleged injuries here, however, are identical to those of Universal, and he has not alleged the existence of a special duty of any kind.

---

[5] Although Defendant Orr has moved for dismissal under N.C.R.C.P 12(b)(6) and not Rule 12(b)(1), the Court dismisses this action against him under Rule 12(b)(1) for lack of subject matter jurisdiction. *See, e.g., Abbott v. N.C. Bd. of Nursing*, 177 N.C. App. 45, 49–50, 627 S.E.2d 482, 485 (2006) (court "may raise the question [of subject matter jurisdiction] on its own motion even when it was not argued by the parties in their briefs"); *Jenkins v. Winecoff*, 267 N.C. 639, 641, 148 S.E.2d 577, 578 (1966) (question of subject matter jurisdiction not argued in briefs but the Court considered the issue *ex mero motu*).

{38} As such, the Court concludes that Moustafa will not be benefited or injured by any judgment in this case and thus is not a real party in interest in this litigation. *Id.* Accordingly, the Court concludes that Universal, not Moustafa, is the real party in interest in this litigation and that Moustafa does not have standing to bring his claims.

Rule 12(b)(6) – Plaintiffs' Contract-Based Claims for Early Termination

{39} As previously discussed, Plaintiffs have asserted claims against the City for breach of contract and breach of the implied covenant of good faith and fair dealing for alleged losses arising from the early termination of the City's annually renewing Taxicab Operating Agreement with Universal. Having determined the Court has subject matter jurisdiction over these claims, the Court now turns to the City's contention that these claims are time-barred and thus should be dismissed under Rule 12(b)(6) for failure to state a claim. See, e.g., *Bowlin v. Duke Univ.*, 119 N.C. App. 178, 183, 457 S.E.2d 757, 760 (1995) ("A 12(b)(6) motion is an appropriate vehicle for dismissing a claim barred by the statute of limitations.").

{40} Plaintiffs have stipulated that, if applicable, their contract-based claims are barred by the two-year statute of limitations under N.C.G.S. § 1-53 because the date this action was filed – June 12, 2014 – was more than two years after the date of the alleged breach – July 17, 2011. (Pls.' Omnibus Resp. Mots., p. 27.) Section 1-53 provides that a two-year statute of limitations shall apply to "[a]n action against a local unit of government upon a contract, obligation or liability arising out of a contract, express or implied." The Court concludes that, by its terms, N.C.G.S. § 1-53 applies to bar Plaintiffs' contract-based claims. *See Jones v. Town of Angier*, 181 N.C. App. 121, 125, 638 S.E.2d 607, 610 (2007) (finding N.C.G.S. § 1-53 to bar claim for breach of implied warranty of merchantability). As a result, the Court concludes that Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing should be dismissed pursuant to Rule 12(b)(6) as time-barred under N.C.G.S. § 1-53.[6]

---

[6] Despite Plaintiffs' admission concerning the two-year statute of limitations, Plaintiffs "contend, to preserve the issue for appeal, that in exercising proprietary functions a local government should be

III.

CONCLUSION

{41} For the foregoing reasons, the Court **GRANTS in part** Defendants' Motions to Dismiss under N.C.R.C.P. 12(b)(1) and **GRANTS in part** the City of Charlotte's Motion to Dismiss under N.C.R.C.P. 12(b)(6) as set forth herein:

a. Plaintiffs' claims against the City of Charlotte for breach of contract and breach of the implied covenant of good faith and fair dealing are hereby dismissed with prejudice under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure; and

b. Plaintiffs' other claims against the City of Charlotte and Plaintiffs' claims against all other Defendants are hereby dismissed with prejudice under Rule 12(b)(1) of the North Carolina Rules of Civil Procedure;

{42} Based on the foregoing, therefore, all of Plaintiffs' claims are **DISMISSED with prejudice**.

{43} In light of the Court's resolution of the Motions, the Court does not reach or consider Defendants' Motions to Dismiss for failure to state a claim under N.C.R.C.P. 12(b)(6) other than as set forth in this Order and Opinion.

**SO ORDERED**, this the 5th day of March 2015.

---

subject to the three-year statute of limitations applicable to private entities." (Pls.' Omnibus Resp. Mots., p. 27.) The Court rejects Plaintiffs' argument that a three-year statute of limitations should apply on Plaintiffs' breach of contract claim in this case. *See, e.g., Jones*, 181 N.C. App. at 125, 638 S.E.2d at 610.